**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Harold I. LIEBERKNECHT,
Defendant–Appellant.**

**No. 39151.**

Missouri Court of Appeals,
Eastern District,
Division One.

Sept. 23, 1980.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Nov. 14, 1980.

---

Rau, Martin & Cervantes, St. Louis, for defendant–appellant.

John Ashcroft, Atty. Gen., Jefferson City, for plaintiff–respondent.

SIMON, Judge.

Defendant, Harold I. Lieberknecht, was found guilty by a jury of murder in the first degree of Peter Muir under § 559.010 [1] and sentenced to life imprisonment by the court pursuant to the Second Offender Act, § 556.280. Defendant appeals that conviction, contending that the court erred in (1) failing to grant defendant's motion for acquittal at the close of the entire case in that there was not sufficient evidence of the defendant's criminal agency; (2) failing to grant an acquittal at the close of the entire case in that there was insufficient evidence of premeditation and deliberation for a conviction of first degree murder; (3) failing to direct a verdict of not guilty by reason of mental disease or defect; (4) failing to direct a verdict of acquittal in that there was insufficient evidence to establish that the victim was Peter Muir, the person named in the indictment; (5) excluding the results of a polygraph examination.

We find these points against the defendant. Accordingly, we affirm the judgment.

This appeal is properly before our court; it is not within the exclusive jurisdiction of our Supreme Court since alternate punishments of death or life imprisonment could not have been given under § 559.010. *State v. Curry,* 578 S.W.2d 283, 284[1] (Mo.App. 1979); Mo.Const. Art. V, Sec. 3.

The evidence showed that the defendant and the victim were talking and drinking together at the bar in the Milner Hotel on

---

1. Statutory references are to RSMo. 1969.

the night of May 14, 1975. At about 9 or 10 o'clock they bought some beer and ice, and left the lounge.

The defendant was next seen at the bar at approximately 11:40 that same night. He got a drink and left.

The nude body of the victim was discovered by a maid at 2:30 P.M. on May 15, 1975 in Room 750 of the Milner Hotel. Room 750 was registered in the name of Peter Muir. The condition of the room did not indicate that a struggle had taken place.

Dr. Watson Kiaminsky, M.D., the coroner's physician, in his post mortem examination, determined that the victim had six stab wounds to the upper back, eight stab wounds to the chest, two stab wounds to the right arm, two stab wounds to the left side of the abdomen and a stab wound on the left side of the nose. There was a large wound of the neck which extended from the left to both sides of the neck and down to the cervical spine, lacerating both the internal jugular veins and the trachea. There was also a transection of the penis at the base, and a large knife was lodged in the left side of the victim's chest. Dr. Kiaminsky determined the cause of death was primarily due to the wound of the neck.

The evidence also showed that the knife found lodged in the victim's chest was covered with blood, type O. Laboratory tests performed on pants seized from the defendant's apartment and pants found in the victim's room revealed the presence of human blood, type O. The victim's blood was found to be type O. Laboratory tests also indicated an alcoholic content in the victim's blood of .171 grams per milliliters. Based on that finding, Dr. Kiaminsky was of the opinion that the victim was under the influence of alcohol at the time of death.

When the defendant was first interrogated by the police he denied having any knowledge of the victim. After the police discovered cuts on the defendant's legs he gave a statement concerning his activities on the night of May 14. The defendant stated, in substance, that he was seated at the bar in the Milner Hotel on the night in question having a drink when a gentleman sat down next to him and they began talking. He later learned that the gentleman was Peter Muir. After talking for about an hour and a half Peter Muir suggested that they go up to his room in the hotel to watch television. Peter Muir ordered six cans of beer and they left the bar together, going upstairs. Once in the room he sat down beside Peter Muir, but Peter Muir got up and put the beer in a basin in the bathroom, and then began showing the defendant a set of knives lying on the dresser in the room. He indicated he didn't touch the knives. He then began switching T.V. channels to show Peter Muir that the T.V. set was working since Peter Muir was upset that the T.V. wasn't working. At that point he did not recall what happened, but the next thing he knew he was lying on the bed nude and Peter Muir had a knife in his hand and told him to perform a sex act. The next thing he recalled was that there was fighting and he felt pins in his legs and blacked out again. When he came to, he was still lying on the bed in the nude. His legs were cut and bleeding and Peter Muir was lying on his back on the floor alongside the bed covered with blood and lying still. He recalled cutting Peter Muir one time. He got up and went to the bathroom and using a towel and water attempted to dress his leg wounds. He then got dressed and left, taking two cartons of Marlboro cigarettes with him that were given to him by Peter Muir prior to any struggle. He then left the room and returned to the Milner Hotel bar, ordered a drink and after drinking it, got on the Delmar Bus and went home. He identified the knife that was removed from the body of Peter Muir as being identical to the knife which he obtained from Peter Muir during the struggle.

An automobile registered in the name of Peter Muir was found approximately one–half to two–thirds of a block from defendant's apartment. The barmaid at the Milner Hotel identified the victim and the defendant as the men in the bar on the evening of May 14, 1975, who left together. A patron of the bar that evening identified the victim and defendant as being together at the bar that evening.

Fingerprints of the victim were identified through F.B.I. records as being those of Edward R. McDermott of Tampa, Florida and the indictment charged the defendant with the death of Peter Muir.

Dr. Gary Kulak, M.D., a psychiatrist, testifying on behalf of the defendant, examined the defendant several times in June, 1976, testified with a reasonable degree of medical certainty that the defendant suffered from an uncommon kind of paranoia and that the defendant had a mental disease or defect within the law of the state of Missouri.

Dr. Henry R. Bratkowski, D.O., Director of the Maximum Security Unit of Fulton State Hospital and a Board certified psychiatrist, testified on behalf of the state. Dr. Bratkowski examined the defendant on two occasions in August of 1975. Dr. Bratkowski concluded with a reasonable degree of medical certainty that the defendant was not suffering from psychosis and could have conformed his conduct to the law and did not have a mental disease or defect within the law.

The case was submitted on instructions of murder in the first degree, murder in the second degree and manslaughter. The jury returned a verdict of guilty of murder in the first degree.

Defendant contends in his first point that the trial court erred in refusing to direct a verdict of acquittal at the close of the state's case, and at the close of all the evidence pursuant to defendant's motion in that the evidence is insufficient to sustain a verdict of guilty in that the time of death of the victim is not medically consistent with or causally related to the presence of the defendant or his opportunity to commit said murder.

■■■ Our review of this point shall be confined to the motion of acquittal at the close of all the evidence since the defendant introduced evidence following the overruling of his motion at the close of the state's case. *Holtkamp v. State*, 588 S.W.2d 183 (Mo.App.1979). In ruling the motion at the close of all the evidence, the probative evidence favorable to the state is taken as true, as are all the legitimate inferences to be deduced therefrom, and all evidence and inferences contrary thereto are disregarded. *State v. Deyo*, 358 S.W.2d 816, 819[2] (Mo. 1962).

It is unclear from the defendant's brief whether he is challenging the sufficiency of the evidence presented by the state concerning the medical causation of death, the corpus delicti of the crime, or the criminal agency of the defendant.

Medical causation involves the question of what caused the victim to die rather than who killed the victim. The evidence clearly established that the victim's death was caused by the multiple stab wounds, primarily the neck wound.

Defendant's argument on the criminal agency of the defendant revolves around the testimony of Dr. Watson Kiaminsky, the coroner's physician. Dr. Kiaminsky performed the post mortem examination and indicated as a part of his finding that at the time of his examination, that rigor mortis was complete and that the "rigor mortis" condition of the body indicated that the victim had been dead for approximately twelve to eighteen hours. Dr. Kiaminsky also stated that the victim would have died within five to ten minutes after receiving the neck wound. The post mortem examination was performed at 11 A.M. on May 16, 1975. Dr. Kiaminsky, not knowing the environmental condition of the room where the victim's body was found and where the victim's body was kept prior to the examination, stated that his finding that rigor mortis was completed at the time of the post mortem examination, would not be inconsistent with the victim having been dead between thirty to thirty–six hours.

Defendant contends that since Dr. Kiaminsky placed the time of death at eighteen hours prior to his post mortem examination, and that the victim would have died within five to ten minutes after receiving the neck wound, the defendant was not the criminal agency responsible for the victim's death because the state's evidence placed the defendant at the Milner Hotel the evening of

May 14, 1975, approximately thirty to thirty-six hours prior to the post mortem examination.

The law in Missouri is well established that "[j]uries and other triers of the facts may believe all the testimony of any witness or none of it, or may accept it in part, just as they find the same to be true or false when considered in relation to the other testimony and facts and circumstances of the case." See *State v. Wynn*, 391 S.W.2d 245, 247[1] (Mo.1965); *State v. Morris*, 564 S.W.2d 303, 309[6] (Mo.App.1978). The testimony of an expert witness is considered like any other witness' testimony and is to be tried by the same tests, and receives just so much weight and credit as the jury may deem it entitled to when viewed in connection with all the circumstances of the case. *State v. Quilling*, 363 Mo. 1016, 256 S.W.2d 751, 752[2] (banc 1953).

The burden is on the state in any criminal proceeding to establish the corpus delicti of the crime charged. The corpus delicti in a murder case consists of two elements; first, the death of a human being and, second, the criminal agency of another in causing the death. Proof that the accused was the criminal agency causing the death is not an element of the corpus delicti; but is required to convict the accused. *State v. Deyo, supra* at 819[4]; *State v. Morris, supra* at 309. The first element of the corpus delicti is the basis of defendant's fourth point on appeal and will be addressed at that time. To establish the second element of the corpus delicti it must be shown that the death of the human being was not self-inflicted, nor due to natural causes or accident. *State v. Morris*, Id. The multiple stab wounds in the neck, chest and back of the victim and transection of the victim's penis at its base clearly establish that the victim's death was caused by the criminal act of another, thus satisfying the second element of the corpus delicti.

Reviewing the evidence in the light most favorable to the verdict of the jury and disregarding the contrary evidence, we find that there was sufficient evidence, direct and circumstantial, to support the verdict.

The evidence placed the defendant and the victim, Peter Muir, at the bar of the Milner Hotel on the evening of May 14, 1975. They left the bar together at about 9 or 10 P.M. and went to the victim's room. The defendant returned to the bar alone at about 11:40 P.M. and had a drink and left. Defendant admitted being in the victim's room, cutting him one time, and leaving the room with the victim on the floor, lying still and covered with blood. He identified the knife found lodged in the victim's chest as the one he had seen in the room. Before leaving, the defendant dressed his leg wounds and took two cartons of Marlboro cigarettes, which the victim had given him earlier. Two cartons of Marlboro cigarettes and defendant's trousers which were stained with blood, the same blood type as the victim's, were recovered from defendant's apartment. The victim's automobile was found within a block of defendant's apartment, which is five to ten miles from the Milner Hotel. The victim's body was found at approximately 2:30 P.M. on May 15, 1975 in his room lying on the floor. The time of 2:30 P.M. on May 15, 1975 is more than twenty hours before the post mortem examination. Dr. Kiaminsky stated his finding would not be inconsistent with the victim having been dead thirty to thirty-six hours. We rule this point against the defendant.

Defendant in his second assignment of error contends that the trial court erred in failing to direct a verdict of acquittal on the charge of murder in the first degree and in submitting an instruction on murder in the first degree to the jury in that the evidence is insufficient to show premeditation as required under § 559.010.

The defendant's point relied on as stated challenges the sufficiency of the evidence on the element of premeditation, but his argument on this point is centered almost entirely on the element of deliberation. The defendant argues that the state did not present sufficient evidence of the deliberation necessary for a conviction of

murder in the first degree, but he failed to set forth in detail and with particularity this issue in his motion for new trial as is required by Rule 27.20(a) (1977). Therefore this issue was not preserved for appeal. However, we shall review this issue under the authority of Rule 27.20(c) (1977), which allows for review of plain errors affecting substantial rights when a point has not been properly preserved for appeal.

■ Section 559.010 mandates that premeditation and deliberation are essential elements of murder in the first degree. " 'Premeditation means thought of beforehand for any length of time, however short.' [citations omitted] This simply means the defendant thought about what he was about to do before he did it." *State v. Marston*, 479 S.W.2d 481, 484[6] (Mo. 1972). Deliberation occurs when the defendant considers the matter of taking another's life in a "cool state of the blood," or with a "cool and deliberate state of mind." *State v. Marston*, Id. at 484[4].

■ The deliberation and premeditation required for a conviction of first degree murder may be established by the circumstances surrounding the homicide. *State v. Nelson*, 514 S.W.2d 581, 582[1] (Mo.1974).

The defendant contends that there was not sufficient evidence of premeditation and deliberation to support a first degree murder conviction. When the sufficiency of evidence is challenged we are obliged to accept as true all evidence, circumstantial or direct, favorable to the verdict, together with all favorable inferences that can be reasonably drawn therefrom, while ignoring all evidence to the contrary. *State v. Deyo, supra* at 819[3].

Here the evidence when viewed in the light most favorable to the verdict shows the following. The defendant and victim met in the bar of the Milner Hotel on the night of May 14, 1975. They were drinking and talking together. They bought some beer and left the bar to go to the victim's room to watch television.

The evidence showing the condition of the room at the time of the discovery of the victim's body did not indicate that a struggle had taken place. Two cartons of cigarettes were still on the bed. The victim was found lying on the floor alongside the bed, his head in front of a night table which was situated directly to the right side of the bed. A beer can on top of the table was lying on its side, but was still in place, on top of the table. A telephone, an ashtray, a cigarette package, a pack of matches, and a bloody washcloth were still in place on top of the table. A chair to the right of the table was in place and a newspaper and a pair of slacks soiled by blood stains were undisturbed on the seat of the chair. Approximately four to five inches to the right of the victim's left leg was a stainless steel platform ashtray and a large wooden dresser. On top of the dresser undisturbed was a box of cutlery with one knife missing, the lid from the box, a shirt, and a book. At the foot of the victim's body were a pair of boots, standing upright. To the left of the bed was a luggage stand with a brown jacket on it. The bedspread was still on the bed but it had been pulled back.

The evidence also showed the defendant cleaned himself before leaving the room and that the victim was lying still on the floor and covered with blood. He took two cartons of cigarettes, and the victim's automobile was found within one block of defendant's apartment. The defendant, after leaving the victim's room, went back to the hotel bar and had a drink.

The record indicates that the victim was of a muscular build, being 6' 1" tall and weighing 175 pounds. The defendant on the other hand was shorter and stout.

■ The evidence was sufficient to support the first degree murder instruction and the verdict. Accordingly, we rule this point against the defendant.

Defendant next contends that the trial court erred in failing to direct a verdict of "not guilty by reason of mental disease or defect" for the reason that the rebuttal evidence of Dr. Bratkowski, the state's psychiatric expert, was based on an incomplete examination and failed to negate the over-

whelming evidence elicited from Dr. Kulak, a psychiatrist, and Dr. Kiel, a psychologist, the defendant's psychiatric experts, that the defendant was a paranoid psychotic and was suffering from a recognized mental disease or defect.

The defendant is asking us to weigh the evidence as to the defendant's mental condition, but that is for the jury.

Section 552.030.7, provides in part:

"All persons are presumed to be free of mental disease or defect excluding responsibility for their conduct, . . . . The issue of whether any person had a mental disease or defect excluding responsibility for his conduct is one for the jury to decide upon the introduction of substantial evidence of lack of such responsibility. * * * [T]he presumption shall not disappear and shall alone be sufficient to take that issue to the jury."

In *State v. West*, 575 S.W.2d 257, 258 (Mo.App.1978), the court stated:

"The emphasized portions of Section 552.030.7, supra, and the cited cases preceding and succeeding its enactment are true to the long accepted principle that the credibility of witnesses and the weight of their testimony are within the decisional domain of the trier of fact and are not subject to review on appeal." (citations omitted)

In the case at bar, the state presented rebuttal evidence of the defendant's sanity. Even without such rebuttal evidence the statutory presumption was sufficient for the issue to go to the jury.

This point is ruled against the defendant.

Defendant in his fourth assignment of error contends that the trial court erred in refusing to direct a verdict of acquittal for the defendant in that the evidence was insufficient to prove the corpus delicti by proving that the victim was identified as the person charged in the indictment beyond a reasonable doubt.

The law in Missouri concerning what constitutes the first element of the corpus delicti of a murder appears unclear. In *State v. Deyo, supra,* our Supreme Court stated that the corpus delicti of a murder consists of two elements. " 'First, the death of a human being and, second, the criminal agency of another in causing the death.' *State v. Morris,* Mo., 307 S.W.2d 667, 673 quoting *State v. Meidle,* Mo., 202 S.W.2d 79, 81." (citations omitted)

However, in *State v. O'Neal,* 436 S.W.2d 241, 244[5] (Mo.1968) our Supreme Court stated that, " '[i]n murder, the corpus delicti consists of two elements; (1) the death of the person alleged to have been murdered, and (2) the criminal agency of someone other than deceased causing the death. *State v. McQuinn,* 361 Mo. 631, 235 S.W.2d 396, 397.' " Neither *Deyo* nor *O'Neal* has been overruled, yet the first element of the corpus delicti in *Deyo* would require only a showing that a human being is dead, while *O'Neal* would appear to require the additional burden of showing the identity of the victim.

Our court has spoken most recently on this issue in the cases of *State v. Dodson,* 551 S.W.2d 932 (Mo.App.1977) and *State v. Stephens,* 556 S.W.2d 722 (Mo.App.1977). In *Dodson, supra* at 935[7], the court stated that "[t]he corpus delicti murder consists of the death of the victim by means of the criminal agency of someone besides the deceased. *State v. McQuinn,* supra 235 S.W.2d at 396[1]."

In *Stephens, supra* at 725[7] the court stated that "[t]he corpus delicti of murder is (1) the death of a human being by (2) the criminal agency of another person and not by suicide . . . . " (citations omitted)

We find that the better view is that the first element of the corpus delicti of a murder consists merely of the death of a human being.[2] There was sufficient evidence presented at trial for the jury to find

---

**2.** C. Torcia, Wharton's Criminal Evidence, Sect. 17 (13th Ed. 1972).

"The corpus delicti, meaning the body or substance of the crime charged, involves two elements: 1) An injury which is penally pro-

scribed–e. g., in an unlawful homicide, a person killed; in larceny, certain property missing; and 2) The unlawfulness of some person's conduct in causing that injury."

that a human being was dead. Therefore, the state met its burden concerning the first element of the corpus delicti.

Although it was not necessary for the state to prove the identity of the victim to satisfy its burden concerning the corpus delicti, the state does have the burden of proving beyond a reasonable doubt that the person named in the indictment as being murdered is the same person proved murdered at trial. This may be done by circumstantial evidence. *State v. Paige*, 446 S.W.2d 798, 803[1] (Mo.1969).

The record indicates that Room 750 where the victim's body was found was registered in the name of Pete Muir. A retail installment contract for the victim's automobile, which was found within a block of the defendant's apartment, was discovered in a pair of pants found in Room 750. The contract showed the automobile was registered in the name of Peter Muir. A manager of some rides for the carnival company for whom the victim was employed, identified the victim's body as that of a man named "Pete" who had worked for him. The victim's body was also identified as that of the man who was seen leaving the lounge with the defendant on the night of May 14, 1975. The defendant stated he later learned that the gentleman, he had been drinking and talking with at the bar, was Peter Muir.

The preceding circumstances constitute sufficient evidence for the jury to have found beyond a reasonable doubt that the man proven murdered was Peter Muir, the person named as the victim in the indictment. The defendant was fully informed of the offense for which he was tried and convicted. He was not prejudiced by the state's failure to recite in the indictment other names the victim may have been known by or may have used. § 545.-030, 40 C.J.S., Homicide § 145. We rule this point against the defendant.

Defendant contends in his last assignment of error that the trial court erred in excluding evidence concerning the use of a polygraph for the reason that the defendant

demonstrated in his offer of proof the foundations of reliability, qualification of the operator of the lie detector and the validity of the test thereby making it admissible for the jury's consideration.

Recently our Supreme Court in *State v. Biddle*, 599 S.W.2d 182 (Mo. banc, 1980) held that "[t]he results of polygraph examinations are inadmissible as evidence in a criminal trial because they lack scientific support for their reliability. *State v. Weindorf*, 361 S.W.2d 806, 811 (Mo.1962); *State v. Cole*, 354 Mo. 181, 188 S.W.2d 43, 51 (1945)." We are bound by that ruling. Defendant's point is without merit.

Judgment affirmed.

STEWART, P. J., and SNYDER, J., concur.